**GOLD STRIKE STAMP COMPANY, a Utah Corporation, Petitioner,**

v.

**A. Sherman CHRISTENSEN, District Judge, Respondent,**

**B. Delos Gardner et al., Real Parties In Interest.**

**No. 411–70.**

United States Court of Appeals, Tenth Circuit.

Dec. 30, 1970.

C. Preston Allen, Salt Lake City, Utah (Merlin O. Baker, Salt Lake City, Utah, on the brief) for petitioner.

Parker M. Nielson, Salt Lake City, Utah (Don A. Stringham, Salt Lake City, Utah, on the brief) for real parties in interest.

Before HILL, SETH and HOLLOWAY, Circuit Judges.

HILL, Circuit Judge.

Petitioner, Gold Strike Stamp Company, seeks a writ of mandamus from this court[1] staying an order issued by District Judge A. Sherman Christensen in the Central Division of the District of Utah in the case of Gardner v. Gold Strike Stamp Company. The order in question found that a class action was appropriate and called for a notice to be sent to all class members.

We have previously stated that "[w]rits of mandamus and prohibition are drastic and extraordinary remedies and should be used sparingly by appellate courts. When used against a trial court, there must be a clear showing of abuse of discretion by the trial court and the right to such relief must appear clear and undisputable." Texas Gulf Sulphur Co. v. Ritter, 371 F.2d 145, 146–147 (10th Cir. 1967).[2] The question of

---

[1]. See McClellan v. Carland, 217 U.S. 268, 30 S.Ct. 501, 54 L.Ed. 762 (1910); Erie Bank v. United States District Court for District of Colorado, 362 F.2d 539 (10th Cir. 1966); and Moore's Federal Practice, Vol. 6 ¶ 54.10.

[2]. Since the order allowing the class action does not have finality required for appeal under F.R.Civ.P. 54(a), a very serious question exists as to whether the merits of Gold Strike's petition should be examined at all. Petitioner claims that irreparable injury will occur if that order is not reviewed at this time in that they will be forced to proceed with expensive discovery procedures and must sustain a heavy trial burden covering all members of the class; that the notice approved by Judge Christensen was incorrectly formulated; and that they fear the question of whether a proper class was constituted will be regarded as harmless error on appeal.

That an order may make the trial more expensive and inconvenient for a party is not in itself sufficient grounds for immediate review although it should be considered. See United States Alkali Export Ass'n v. United States, 325 U.S. 196, 202–203, 65 S.Ct. 1120, 89 L.Ed. 1554; 6 Moore's Federal Practice ¶ 54.10 [4].

In alleging the possibility that on appeal the class action will be regarded as "harmless error" petitioner refers to change of venue cases, i. e., Whittier v. Emmet, 108 U.S.App.D.C. 191, 281 F.2d 24 (1960) and see Pacific Car and Foundry Co. v. Pence, 403 F.2d 949 (9th Cir. 1968). Certainly courts have been somewhat liberal in reviewing orders on change of venue, e. g., Cessna Aircraft Co. v. Brown, 348 F.2d 689 (10th Cir. 1965); see 6 Moore's Federal Practice ¶ 54.10 [4], pp. 96–101. However, the arguments for immediate review in change of venue cases do not necessarily apply to the instant case. For example, under the provisions of Rule 23(c) (4) and 23(e) of the Federal Rules of Civil Procedure the trial judge maintains a great degree of control over the conduct of a class action trial. This control has been commented on by this court in Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968), cert. denied 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459, and allows the trial judge to modify or terminate the action as a class action if it develops that the decision to so proceed was inappropriate. Secondly, there is no indication that the question of whether a class action was properly allowed will not be fully considered on appeal from the final judgment reached in the case. See 3B Moore's Federal Practice, ¶ 23.97.

It is entirely conceivable that the facts presented in a particular case may justify the immediate review of an order allowing a case to proceed as a class action. Whether or not the instant case presents such facts will not be decided. Following a practice which the Supreme Court has found admissible, we will find the order to be correct and deny the writ without a final decision as to its availability. See Ex Parte Collett, 337 U.S. 55, 69 S.Ct. 944, 959, 93 L.Ed. 1207 (1949); Ex Parte Bakelite Corp., 279

whether to allow a suit to proceed as a class action is one primarily for the determination of the trial judge. If he applies the correct criteria to the facts of the case, the decision should be considered to be within his discretion. City of New York v. International Pipe and Ceramics Corp., 410 F.2d 295, 298 (2d Cir. 1969). From the findings of fact made by Judge Christensen in his order of July 21, 1970, it is apparent that he did apply the correct criteria and his finding that the class action should proceed did not constitute an abuse of discretion.[3] In Esplin v. Hirschi, 402 F.2d 94 (10th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459, this court discussed the basic rules concerning class actions allowable under the newly amended Federal Rule of Civil Procedure 23 and in particular class actions allowable under 23(b) (3). In Hirschi we held that a 10(b) (5) securities fraud case was suitable for class action even though there were individual questions of oral misrepresentations to each of the potential plaintiffs because " * * * the real basis of their allegations concerns the failure of the defendants to make any representations concerning relevant and material facts, i. e., certain omissions of material facts common to all purchasers * * *. Consequently, there does exist as to the totality of issues a common nucleus of operative facts * * *." Id. at 99. The general law from the other Circuits concerning the application of newly amended Rule 23(b) (3) was reviewed and discussed and the critical test was set out to be "whether there is 'material variation' in elements like the representations made by the defendants * * *." upon which liability was based. Ibid. The court noted the superiority of class action procedures as opposed to intervention in a suit involving a large number of injured parties. It was stated that because of the great amount of control that the trial judge retains over

U.S. 438, 448, 49 S.Ct. 411, 73 L.Ed. 789 (1929); Texas Gulf Sulphur Co. v. Ritter, 371 F.2d 145 (10th Cir. 1967).

3. The following pertinent findings were made by Judge Christensen in his Order of July 21, 1970.

"(a) Plaintiffs are representative of a class of persons composed of all persons in the State of Utah who deal with Gold Strike Stamps and who are engaged in the retail sale of petroleum products, or who were engaged in the retail sale of petroleum products at any time after January 1, 1965.

"(b) The class of persons alleged is numerous, consisting of several hundred persons, thus making joinder of all members of the alleged class impracticable.

"(c) There are questions of law or fact common to the members of the alleged class, including in particular the policies of Gold Strike Stamp Company with respect to the distribution of its trading stamps and the application of the Federal Antitrust Laws, and the Utah State Unfair Trade Practice Laws, to the practices of defendant, as alleged in plaintiffs' amended complaint.

"(d) The claims or defenses of the representative parties are typical of the claims or defenses of the members of the class by reason of the probability that market conditions affecting class members in the State of Utah will be substantially the same and by reason of the further fact that the market in which Gold Strike Stamps are distributed by petroleum retailers will, in probability, be the same as between all petroleum retailers in the State of Utah.

"(e) The representative parties will fairly and adequately protect the interests of the class.

"(f) The questions of law or fact common to the members of the class predominate over any questions affecting only individual class members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors indicating the desirability of a class action include the probability that a class composed of the petroleum retailers in the State of Utah could be efficiently managed and the desirability of the concentration of litigation concerning the rights of such petroleum retailers in this forum by reason of the presence of the members of the class in the State of Utah and the presence and principle [sic] place of business of the defendant in the State of Utah.

"(g) The names and addresses of the members of the class are readily ascertainable from the records of defendant Gold Strike Stamp Company."

the class action suit, specifically with respect to modification allowed under 23(c) (4), if there was to be error on the part of allowing or disallowing a class action suit it should be on the side of allowing class actions to proceed. Ibid.

The instant suit involves allegations of various antitrust violations by Gold Strike Stamp Corporation in the initiation of and conduct of their trading stamp business in the State of Utah.[4] The plaintiffs, B. Delos, Vern, Lincoln, Darrel and Ken Gardner, and the class of injured parties they seek to represent are petroleum retailers, i. e., service station operators, within the State of Utah. They allege that the defendant corporation, Gold Strike Stamp, was set up and controlled by the retail food industry and has acted in concert with the retail food stores to monopolize the trading stamp business within the retail food industry in the State. Plaintiffs allege that since the retail food stores represent the majority of all retail sales, a large demand for defendant company's trading stamps was created which forced the plaintiffs to take part in the trading stamp program and in particular with Gold Strike Stamp Company. It is further alleged that the retail food stores were sold a pad of 5,000 stamps from Gold Strike for approximately $8.00 whereas plaintiffs were charged $12.50 for the identical book of stamps.

There are four basic theories postulated by the plaintiffs as to Gold Strike's violations of the antitrust laws.[5] Their first theory is that Gold Strike, by its practices and in conspiracy with its "favored" customers, the retail food industry, has restrained trade and has monopolized the trading stamp business [6] in violation of the provisions of § 1 and § 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. See Northern P. R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. Consolidated Laundries Corporation, 291 F.2d 563, 572–573 (2d Cir. 1961).

Plaintiffs' second theory of violation is that they were required to enter into franchise agreements with Gold Strike, the provisions of which required the plaintiffs to deal with them to the exclusion of all other trading stamp companies, in violation of § 3 of the Clayton Act, 15 U.S.C. § 14. See Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), Tampa Electric Co. v. Nashville Coal Co., 365 U. S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

Plaintiffs' third theory of violation is that by selling the stamps to the retail food store industry at a lower price Gold Strike violated § 2 of the Robinson-

---

4. The original complaint included the entire operating area of Gold Strike Stamp Corporation, an alleged four state area; however, the scope of this action was reduced and now concerns solely the happenings within the confines of the State of Utah.

5. In addition, plaintiffs set out that defendants violated the applicable sections of Utah State Unfair Practices Act § 13–5 Utah Code Annotated (1953). As the same violations are covered by the federal statutes, the particular state statutes will not be discussed.

6. There is little question but that trading stamps are such an item of commerce as

to constitute a relevant market for determining restraint of trade and monopoly position. They are a marketable commodity in which several brands exist across the nation. While not sold as such to the consumer, they are sold to retailers who then distribute them to consumers in proportion to the amount purchased as an incentive for shopping at their establishment. Certainly as to the various brands of stamps there is competition as to selling to retailers and also in getting customers to collect their stamps. In any respect the determination of this question is one for the trial court and is a common issue for the class.

Patman Act [7] in that the price difference given to the two different classes had the tendency to or enabled Gold Strike to create a monopoly in the trading stamp business. In particular it was alleged that the price discrimination enabled Gold Strike to saturate the market creating an artificial demand for its stamps and thus enabling it to achieve or tend to achieve a monopoly position in the trading stamp business. See Van Camp & Sons Co. v. American Can Co., 278 U.S. 245, 49 S.Ct. 112, 73 L.Ed. 311 (1929); cf. Federal Trade Comm. v. Anheuser-Busch, Inc., 363 U.S. 536, 547, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960). By focusing on the creation of a monopoly in the trading stamp business, plaintiffs do away with the need to show effect upon competition between themselves and other buyers of Gold Strike Stamps, as normally required in price discrimination cases. E. g., Federal Trade Comm. v. Borden Co., 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966).

In each of the above three theories of violation there is little question but that the case is superbly suited for class action. The various elements which plaintiffs must show to establish the requisite violations are common to all members of the alleged injured class, i. e., that the trading stamp business is a line of commerce, that Gold Strike acted in conspiracy or concert with the retail food industry, that Gold Strike discriminated in price between the retail food industry and service station operators, and that Gold Strike achieved a monopoly position in the trading stamp business in the relevant geographical area.

Plaintiffs' fourth theory of antitrust violation also involves a price discrimination question under § 2 of the Robinson-Patman Act, 15 U.S.C. § 13. As to this theory, plaintiffs are alleging a lessening of competition between themselves and the favored customers, i. e., the retail food industry, on various specific items in which the two classes compete. It is this aspect of the case that petitioner contends unsuitable for the class action procedure.

To be entitled to a recovery under the above theory, plaintiffs must first show that there was a price discrimination on goods of like grade and quality. Federal Trade Comm. v. Borden Co., 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966).[8] Secondly, the plaintiffs must show that this price differential had an effect on their ability to compete with the favored customers and, thirdly, of course, plaintiffs must show the amount of their damages. It is petitioners' primary contention that establishing the effect on competition will of necessity involve questions concerning each individual class member; that each class member must show the extent to which they compete and the effect that the trading stamp price difference made upon their ability to compete; and therefore individual issues predominate over common issues making a class action on this theory of recovery unsuitable. For this proposition petitioner relies primarily upon Minneapolis-Honeywell Regulator Co. v. Federal Trade Comm., 191 F.2d 786 (7th Cir. 1951); Quaker Oats Co., 1963–65, Transfer Binder, CCH Trade Reg. Reporter ¶ 17,-

7. 15 U.S.C. § 13 states in part, "It shall be unlawful for any person * * * to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, * * * and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. * * *"

8. The price discrimination alleged here refers to price difference paid for the trading stamps by service station operators and retail food stores. Whether such price discrimination existed without legal justification is, of course, a common question for each member of the service station class.

134 (FTC 1964); Chicken Delight, Inc. v. Harris, 412 F.2d 830 (9th Cir. 1969); and Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y.1968).

If petitioner's contentions are true as to what must be shown to establish the required effect upon competition, a definite problem as to the appropriateness of the class action would arise. A sound argument could be made that the suit would then break down into individual suits on the question of liability. In previous 23(b) (3) antitrust cases it appears that a dichotomy has arisen where the question of liability is established by common issues and where the question of liability depends upon the determination of individual issues. Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968); State of Minnesota v. United States Steel Corp., 44 F.R.D. 559 (D.Minn.1968); Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E.D.Pa.1968); State of Iowa v. Union Asphalt and Roadoils, Inc., 281 F.Supp. 391 (S.D.Iowa 1968); School District of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa.1967); Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal. 1967); Moore's Federal Practice, Vol. 3B, ¶ 23.45[2] and see Note, Antitrust Conspiracy under Amended Rule 23, 54 Va.L.Rev. 314 (1968). We would not say that this of necessity presents the dividing line between antitrust cases that are suitable for class action and those that are not. However, where the question of basic liability can be established readily by common issues, then it is apparent that the case is appropriate for class action. We do not believe that the question of liability in the instant case requires the specific individualistic examination that petitioner proposed.[9]

It has been established in this Circuit that the burden is on the plaintiff to show that the alleged price discrimination has an effect on competition. Elgin Corp. v. Atlas Building Products Co.,

251 F.2d 7 (10th Cir. 1958), cert. denied 357 U.S. 926, 78 S.Ct. 1371, 2 L.Ed.2d 1370 (1958). There has not been, however, well established criteria as to what elements must be shown before the requisite effect on competition is determined. In Federal Trade Commission v. Morton Salt, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), the Supreme Court found that where the evidence did show that quantity discounts resulted in price differentials between competing purchasers sufficient in amount to influence a resale price on salt, this was sufficient to infer that there was a "reasonable possibility" that competition may be affected sufficiently to satisfy the injury to competition requirement of the Robinson-Patman Act.

In Antitrust Developments, 1955–1968, Supplement Report of the Attorney General's National Committee to study the Antitrust Laws, 1955, pp. 124–128, it is noted that cases apparently divide along two lines, one showing a trend away from the inference technique and the other relying on the Morton Salt doctrine. The two cases relied upon by petitioner, Minneapolis-Honeywell, supra, and Quaker Oats, supra, were both cited as cases illustrative of the trend away from the Morton Salt doctrine. The determination of whether these cases do indeed establish a different theory required for recovery or are the result of different factual situations is not necessary to the result in this case. The defense allowed in Minneapolis and Quaker Oats that the price differential was de minimus in relation to the overall cost and thus could have had no effect upon competition would be available to the petitioner in the instant case. It is important that the statute does not speak of actual effect on competition but rather the plaintiff has merely to establish that there is a reasonable possibility that the price differential in question would have an effect on competition, i. e., Federal Trade Commission v. Morton Salt,

9. These specific questions may well arise in establishing the amount of damages available to each individual member of the class.

supra; Standard Motor Products, Inc. v. Federal Trade Comm., 265 F.2d 674 (2d Cir. 1959); E. Edelmann & Co. v. Federal Trade Comm., 239 F.2d 152 (7th Cir. 1956). This is a factual determination and the question becomes whether the nature of the evidence that must be introduced to support or can be introduced to refute such a finding can be generalized so as to cover the entire class.

Although the price discrimination alleged is on trading stamps, to determine its effect upon competition between service stations and grocery stores an examination must be made of those purchasable items which are common to both service stations and grocery stores.[10] The stamps are not sold as such, but are rather given with the purchase; still their purchase price must be considered as a part of the cost of the item sold.

In establishing effect on competition the plaintiff must show the relevant market of competition which is traditionally composed of a geographical and a product market. Brown Shoe Co. v. United States, 370 U.S. 294, 324, 82 S. Ct. 1502, 8 L.Ed.2d 510 (1962). Petitioner argues that the geographical market in question must be each individual store's area of competition and that before liability can be established it must be shown that each service station owner had in fact competition from a grocery store owner. However, realistically considering the probability of saturation of service stations and retail grocery stores that deal in petitioner's stamps, it is much more feasible to consider as a relevant geographical area the area in which petitioner distributes its stamps or, as limited in this case, the State of Utah. See Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967); Standard Oil

Co. of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), and Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). Plaintiffs can establish by the number of stores participating in petitioner's program the degree of saturation of the area in question. Certainly it is difficult to imagine that there exists an area in which a service station does not draw from the same customers as some grocery store. In the present age, gasoline has become the same basic necessity as food.

Likewise on the question of the relevant product market, it is not necessary to examine the effect of competition on each individual item between grocery stores and service stations. It is sufficient that plaintiffs can show as a class that various items did exist upon which competition existed and that the difference in cost between these items resulting from the price differential of the trading stamps did affect competition. Plaintiffs can establish that a service station is a low profit-high turnover business in which the effect of small differences can be major. The fact that this is a small portion of the whole business done by both classes of competitors is irrelevant. See Federal Trade Comm. v. Morton Salt Co., supra, 334 U.S. at 49, 68 S.Ct. 822. Judge Christensen found that the plaintiffs', Gardners', claims were representative of all members of the class. This does not mean, however, that either plaintiffs or petitioner is limited to the examination of only Gardners' circumstances. Other representative dealers may be examined to establish the effect on competition or, in the case of petitioner's claims, to show the lack of effect on competition. The important thing is that it may be shown

10. Plaintiffs allege the following items to be common purchasable items: Cleaning solvents or preparations, polishing or waxing compounds and related products employed in automobile or domestic cleaning; automotive parts, supplies and accessory items, including radios, batteries, flashlights and hand tools; household tableware, appliances and related domestic items; sporting goods and supplies; work gloves and various items of work clothing; and various petroleum products, including household and automotive lubricants.

generally for the class that there was a reasonable possibility the price discrimination on the trading stamps affected competition between the two classes. Upon the resolution of this issue by the fact finder rests the question of liability.

On the question of damages, of course, each individual will have to show the products that it carried upon which competition existed and the effect of the price discrimination upon its profits and the injury to its business. The fact that there may have to be individual examinations on the issue of damages has never been held, however, a bar to class actions. E. g., Eisen v. Carlisle & Jacquelin, supra. In light of the above discussion it is clear that Judge Christensen was correct in his decision that common issues predominate so that a class action under 23(b) (3) is properly allowable.

The cases relied upon by petitioner, Chicken Delight, Inc. v. Harris, 412 F.2d 830 (9th Cir. 1969), and Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y.1968), simply covered different factual situations than the case presented here. In *Chicken Delight* the Ninth Circuit found that a class action was not appropriate to show a resale price maintenance antitrust violation as this would involve reviewing defendant's actions with each of its individual franchisees. We note that the individual examinations deemed to be required in that case involved the question of liability and not damages as in the present case. *Moscarelli* involved a liability of a broker to his customers for churning, i. e., excessive turnover of customers' accounts, and fraud relating to this churning. The court found that no common cause of action existed so as to allow common issues to predominate and denied the class action. Again, an individual examination involving each class member was required before a decision of violation or liability could be established. Nothing in these cases prevents us from finding that common issues predominate in the instant case and thus that a 23(b) (3) class action is appropriate.

The second element of finding that a particular case is suitable for class action under 23(b) (3) is that the class action be superior to other available methods for fair and efficient adjudication of the controversy. The findings of Judge Christensen that the representative parties are well suited for presenting the claims of the class and that the class action is superior to other available methods of adjudication because of the size of the class, the fact that the class is well known as a group and can be efficiently managed, and because of the desirability of concentrating the litigation in the State of Utah which is the principal place of business of defendant are not seriously contradicted by petitioner.

Therefore, we find that this case is easily within the limits established by this court in *Hirschi* and by other Circuits applying newly amended Rule 23, e. g., Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968), and that the case is suitable for proceeding as a class action.

The final question in this case regards petitioner's claim that the notice approved by Judge Christensen to be sent out to members of the class does not sufficiently describe the various causes of action alleged against petitioner so as to enable a prospective class member to choose between coming in on all of the action or only one or two portions of the action. In examining the comments made concerning the notice provisions of newly amended Rule 23, i. e., 23(c) (2) which requires mandatory notice in case of a (b) (3) class action, the primary concern is apparently to insure that the potential class member is aware of the suit being brought, the nature of the suit and the fact that unless he takes affirmative action he will be bound by the outcome of the suit. See Advisory Committee's Note, 39 F.R.D. 106. The fact that it was noted that general inquiries may be directed to the court following the initial notice is an indication that the nature of the notice was

to be informative and not comprehensive. See Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39, 43–45. The only items specifically required to be included in the notice as set out in paragraph (c)(2) are that "the notice shall advise each member that (A) the court will exclude him from the class if he so request by specific date; (B) a judgment whether favorable or not will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel." The notice approved by Judge Christensen includes these mandatory provisions and in addition states that "the complaint alleges that the Gold Strike Stamp Company has operated a trading stamp program in a manner which discriminates against petroleum retailers which dispense stamps, because the petroleum retailers are required to pay $12.50 per pad, or roll, for stamps where persons engaged in retail grocery sales pay $8.00 per pad or roll. The plaintiffs claim that the conduct of Gold Strike is a violation of state and federal laws regulating trade and commerce (the Robinson-Patman Act, Sherman Antitrust Act, Clayton Antitrust Act and State Unfair Trade Competition Act). Gold Strike Stamp Company has denied the allegations of the plaintiffs and has alleged affirmative defenses which defendants claim bar the cause of action asserted by the plaintiffs and are contesting the case." We feel that the Rule places the control of class actions and in particular the issuance of notice to members of the class under the control and thus the discretion of the trial judge. If all the various causes of actions, theories of recovery and defenses alleged in the complaints and answers were required, the notice provisions could well become unduly expensive. This is certainly a factor to be considered by the trial judge. Under the mandate of Rule 23 it is clear that the function of giving notice is well served by the particular notice approved in this case,[11] and that there is no need to change the format of said notice.

The writ is denied and petitioner's action is dismissed.

11. See Kaplan, Continuing Work of the Civil Committee 1966 Amendments of the Federal Rules of Civil Procedure, 81 Harvard L.Rev. 390–400 (1968).